7443

## GILLILAND & GAFFNEY v. SOUTHERN RY.

1. CARRIER—LIVE STOCK.—Under a bill of lading for an interstate shipment of horses, making it the duty of the owner to feed and water, but of carrier when he fails to do it, the carrier is liable for damages resulting to the stock from failure to furnish shelter while it has them unloaded for food and rest under the Federal statute, page 918, of Compiled Statutes Sup., 1907.

2. IBID.—IBID.—WAIVER.—Where a bill of lading in an interstate shipment of live stock from Georgia into this State provides that claim for damages must be made in writing before the stock are unloaded and mingled with other stock, and where the consignee unloads and mingles the stock with others without making claim in writing but

notifies carrier's agent over telephone of damage, and is instructed to call in a veterinary surgeon to examine them and the carrier would pay the bill, this is some evidence of waiver of the stipulation by the carrier.   The same rule would apply under the Georgia law.

3. PRINCIPAL AND AGENT—PRESUMPTIONS.—Where one connects his business office with a telephone exchange and one having business with him talks over the telephone with one in his office, as his agent, about the business there conducted, such person is presumed to be the agent of the principal as to the business there conducted.

Before KLUGH, J. Spartanburg.   Fall Term, 1908. Affirmed.

Action by Gilliland & Gaffney against Southern Railway Company.   From judgment for plaintiffs, defendant appeals.

*Messrs. Sanders & DePass,* for appellant, cite. *This being a Georgia contract, must be construed according to the laws of Georgia:* 73 S. C., 145. *So construed, defendant is not liable:* 41 S. E., 566, 653; 45 S. E., 223; 36 S. E., 946; 17 S. E., 934; 13 S. E., 711; 76 Ga., 253; 73 Ga., 722; 71 Ga., 61; 68 Ga., 805. *How agency shown:* 17 S. C., 142; 39 S. C., 535; 44 S. C., 91. *In office communicating by telephone:* 35 Ill. App., 540; 103 Ill. App., 623; 48 Pac., 933; 40 Am. St. R., 590; 99 Am. St. R., 947; 55 S. E., 495.

*Messrs. Wilson & Osborne,* contra, cite: *Agent communicating over telephone:* 3 L. R. A., 541; 23 Mo. App., 451; 17 L. R. A., 440; 10 Am. St. R., 135; 27 Am. St. R., 366; 86 Am. D., 412; 2 Am. St. R., 243. *Liability of carrier:* 60 S. E., 355; 59 S. E., 209; 52 S. E., 680; 56 S. C., 148; 58 S. C., 267; 52 S. C., 50. *Stipulation as to notice of damage was waived:* 81 S. C., 472; 78 S. C., 397, 36 S. E., 348; 27 S. E., 74; 24 S. E., 704; 61 S. E., 1050.

February 21, 1910.  The opinion of the Court was delivered by

MR. JUSTICE WOODS. On February 27, 1907, the plaintiffs, dealers in horses and mules, shipped a carload of stock consisting of eleven horses and five mules from Atlanta, Ga., to Spartanburg, S. C., over the defendant's railroad. A judgment was recovered for injuries to the stock in transit under this allegation: "That at Greenville, South Carolina, a station on its line, defendant unloaded such stock in an unfit, unsuitable and unprotected place, where for several hours they were subjected in the mud to very severe cold, rain, wind and sleet; in consequence of which they contracted severe colds and other ailments, were stiffened, hair-turned and rendered unsalable, and permanently injured, and plaintiffs thereby made to suffer much damage." It was further alleged in the complaint that the plaintiff had specially warned the defendant not to expose the stock to such weather.

The first defense was a general denial, but the defense involved in the appeal is that the plaintiffs, in consideration of a reduced freight rate, made a contract with the defendant, embodied in the bill of lading in this language: "That he will load and unload said animals at his own risk, and feed and water and attend the same at his own expense and risk while they are in the stock yards of the railway company awaiting shipment, and while on the cars, or at feeding or transfer points, or where they may be unloaded for any purpose, whether arising from accident or from delay of trains, or otherwise, and to that end he or his agent in charge of said live stock shall pay regular published passenger fare when proper under rules governing transportation of live stock, and shall ride upon the freight train in which said animals are transported, and in case the railroad company shall furnish laborers to assist in loading and unloading or caring for said live stock, they shall be subject to the orders and shall be the employees of the party of the second part while assisting, *provided,* however, that in the event that the party of the second part shall fail to properly

care for, feed or water the said live stock during transportation the railroad company may, itself, care for, water and feed the same at the expense of the owner thereof, and shall and may have a lien upon the said live stock for the amount of its expenditures in that respect."

The answer further alleges: "That the plaintiffs failed to attend to the said horses and mules, or to unload, feed and water and care for the same as they had contracted to do, and that any injuries which came to the said animals were caused by the failure of the plaintiffs to comply with their said contract, as hereinbefore stated."

The answer set up also this provision of the contract: "That as a condition precedent to any right to recover any damages for loss or injury to said live stock, notice in writing of the claim thereof shall be given to the agent of the carrier actually delivering said live stock, wherever such delivery may be made, and such notice shall be given before said live stock is removed or is intermingled with other live stock;" and alleged that the plaintiff unloaded the stock and allowed it to be mingled with other stock before making any claim.

The evidence offered by the plaintiff, none of which was disputed, tended to establish these facts: the horses and mules were delivered in good condition to the defendant company in Atlanta, and a bill of lading was issued containing the stipulations above set out. Neither of the plaintiffs accompanied the stock or made any provision for their care. The defendants unloaded the animals in their yard at Greenville, an intermediate station, and fed and watered them. This was done at night in a very cold rain, and the yard was uncovered and muddy. The plaintiffs attempted to prevent the unloading on account of the severity of the weather, but when the message reached Greenville the horses and mules were already in the yard.

The first position taken by the defendant's counsel is that the Circuit Judge should have directed a verdict as requested

3—85

by them on two grounds: First, "That under the law of
Georgia it was the duty of the plaintiffs, under their con-
tract with the defendant, to go along with the animals at
their own risk, feed, water and attend to the same, and as
the evidence shows conclusively that they failed to do so,
they could not under the law of Georgia recover against the
defendant for any damages done said animals while being
fed and watered by the defendant in the absence of the
plaintiff.   Second, That the plaintiffs failed to give notice
of the injuries to the stock, to the agent of the defendant
delivering it, as required by the other clause of the bill of
lading set out in the answer."

The contract of shipment was made in Georgia and
required part performance in that State and part in South
Carolina.   The rule which prevails in most jurisdictions,
including this State, is that under such conditions
any question as to the nature, validity and interpre-
tation of that portion of the contract to be performed
partly in Georgia and partly in South Carolina, namely, the
portion which related to safe transportation from the point
of delivery to the point of destination, would be determin-
able under the laws of Georgia, unless there was evidence
of the intention of the parties that a different law should
be applied.   *Frasier* v. *Charleston & Western Carolina Ry.,*
73 S. C., 140, 52 S. E., 964.   Wharton on Conflict of Laws,
1062-1064.   The record indicates that the Circuit Judge
adopted the general rule and applied the laws of Georgia in
the trial of the case.

The Supreme Court of Georgia has held, as shown by the
reports of that State introduced by the defendant, that under
such a bill of lading as this, the shipper cannot hold the car-
rier liable for injuries which resulted from failure to
properly load and unload the stock, or for lack of feed,
water and attention; because the shipper undertakes to load
and unload, and to supply necessary feed, water and atten-
tion, *Susong v. Fla. Cent. R. R. Co.,* 41 S. E., 566; *Seaboard*

*R. R.* v. *Cauthen,* 41 S. E., 653; *Central of Ga. R. R. Co.* v. *James,* 45 S. E., 223. But that Court has also held that for a common carrier to avail itself of an exception to its usual liability, set out in the contract of shipment, it must show that the injury and loss fell within the exception, and were not caused by its negligence. *Atlanta etc. R. R. Co.* v. *Broome,* 60 S. E., 353; *Carter* v. *Sou. R. R. Co.,* 59 S. E., 209.

Applying the law as thus laid down, it was the duty of the shipper to load and unload and supply food, water and attention, but it was the duty of the railroad company to supply a proper place to unload the stock and to have proper protection for them; and if the horses and mules were injured because the carrier neglected to have a proper place and proper protection for the unloading, it would be liable for the resulting injury. There was evidence tending to show that the injury was due to the negligence of the carrier in these particulars, and therefore the Circuit Judge was right in refusing to instruct the jury that the mere fact that the animals were injured *"while* being fed and watered" would, under the law of Georgia, prevent recovery, and in charging instead: "The stipulation between the plaintiff and the defendant in this part of the contract does not refer to the place where the stock is to be unloaded except to refer to the stock yards and transfer and feeding points  The matter of transfer and feeding points is a matter that is within the control of the railroad company, and not of the plaintiff, and is not embraced in this stipulation of the contract. * * *  If the stock were unloaded at some place provided by the railroad and that place was unsuitable and unfit for that purpose, then if injury resulted to the stock from the fact of their being unloaded there, that would be a matter for which the railroad would be responsible, and not the plaintiff. That would be as much in the control of the defendant as the running of its trains."

As both parties acquiesced in the application of the laws of Georgia, this conclusion as to the law of that State is decisive of the question now under consideration as made in this case, whether the laws of Georgia were really applicable or not.  There is, however, a Federal statute which was not called to the attention of the Circuit Court.  It provides:

"That no·railroad, express company, car company, common carrier other than by water, or the receiver, trustee, or lessee of any of them, whose road forms any part of a line of road over which cattle, sheep, swine or other animals shall be conveyed from one State or territory or District of Columbia, or the owners or masters of steam, sailing or other vessels carrying or transporting cattle, sheep, swine or other animals from one State or territory or District of Columbia into or through another State, territory or District of Columbia, shall confine the same in cars, boats, or vessels of any description for a period longer than twenty-eight consecutive hours without unloading the same in a humane manner, into properly equipped pens for rest, water and feeding, for a period of at least five consecutive hours, unless prevented by storm or other accidental or unavoidable causes which cannot be anticipated or avoided by the exercise of due diligence or foresight: *Provided,* That upon the written request of their owner or person in custody of that particular shipment, which written request shall be separate and apart from any printed bill of lading, or other railroad form, the time of confinement may be extended to thirty-six hours.  In estimating such confinement, the time consumed in loading and unloading shall not be considered, but the time during which the animals have been confined without such rest, or food, or water on connecting roads shall be included, it being the intent of this act to prohibit their continuous confinement beyond the period of twenty-eight hours, except upon the contingencies hereinbefore stated: *Provided,* That it shall not be required that sheep be unloaded in the nighttime, but where the time expires in the

nighttime in case of sheep, the same may continue in transit to a suitable place for unloading, subject to the aforesaid limitation of thirty-six hours.

Sec. 2. "That animals so unloaded shall be properly fed and watered during such rest either by the owner or person having the custody thereof, or in case of his default in so doing, then by the railroad, express company, car company, common carrier other than by water, or the receiver, trustee, or lessee of any of them, or by the owners or masters of boats or vessels transporting the same, at the reasonable expense of the owner or person in custody thereof, and such railroad, express company, car company, common carrier other than by water, receiver, trustee or lessee of any of them, owners or masters, shall in such cases have a lien upon such animals for food, care and custody furnished, collectible at their destination in the same manner as the transportation charges are collected, and shall not be liable for any detention of such animals, when such detention is of reasonable duration, to enable compliance with section one of this act; but nothing in this section shall be construed to prevent the owner or shipper of animals from furnishing food therefor, if he so desires." Compiled Statutes Sup., 1907, page 918.

To the extent that this statute fixes the duties and liabilities of the shipper and carrier in interstate transportation it is obviously controlling, and displaces any State law on the subject.

With respect to interstate commerce the Supreme Court of the United States adheres to the rule that a common carrier cannot contract for exemption from liability for the injuries resulting from its own negligence; and that under a contract like that evidenced by the bill of lading in this case, the burden is on the carrier to exempt itself from liability by showing that the injury resulted not from its negligence, but from the breach of contract or negligence of the owner or shipper; and further that any stipulations for

exemption from liability are to be construed strictly against the carrier. *Chicago, M. & St. P. Ry.* v. *Solan,* 169 U. S., 133, 42 L. Ed., 688; *Niagara* v. *Cordes,* 21 Howard 7, 16 16 L. Ed., 41; *New Jersey etc. Co.* v. *Merchant's Bank,* 6 Howard, 344, 12 L. Ed., 465; *Texas etc. R. R. Co.* v. *Reiss,* 183 U. S., 621, 46 L. Ed., 358.

We have found no case from any of the Federal Courts deciding that in a case like this the carrier would be liable, or indicating that the carrier would be liable in any case to the owner under a contract like that now under consideration, for injuries resulting from failure to provide food, water and proper attention when the owner fails to do so. The Federal statute regulating interstate shipments of stock is, however, substantially the same as the statute of this State regulating shipments of stock within the State, the only point of difference material here being that the State statute imposes upon the owner the duty to feed, water and *shelter* during the period of rest, while the duty to *shelter* is not imposed on the owner in the Federal statute. In construing the State statute, this Court held that as the statute requires the carrier to feed, water and shelter the stock in case the owner failed to do so, and gives the carrier a lien for expenses incurred, the carrier is liable to the owner for injuries resulting from failing to supply proper food, water and shelter. *Comer* v. *R. R. Co.,* 52 S. C., 36, 29 S. E., 637; *Crawford* v. *Ry. Co.,* 56 S. C., 136, 34 S. E., 80. In the absence of Federal decisions on the question, we must give the same construction and effect to the Federal statute, and hold that the carrier is liable to the owners for injuries resulting from its failure to supply proper shelter and protection at Greenville, where the horses and mules were unloaded to be fed and watered.

The conclusion is that in no view of the law can the exceptions on this point be sustained.

The second ground on which the defendant requested the Court to direct a verdict is also untenable. The plaintiff, it

is true, did not give notice in writing, to the carrier's agent who delivered the stock, of the claim for damages for injuries before the horses and mules were unloaded and intermingled with other stock, and the bill of lading expressly stipulated that such notice should be a condition precedent to any right to recover damages for loss or injury to the stock; but there was evidence of waiver of this condition sufficient to carry the case to the jury. The plaintiff, Gaffney, testified that after the horses and mules had been unloaded and mingled with other stock he called for telephone connection with defendant's office; that some one answered and told him to get a veterinary surgeon and have an examination made of the injured animals, and the company would settle the bill; and that he complied with the request. If the request on which the plaintiffs acted, that the plaintiffs should take the pains to procure a veterinary surgeon and have him examine the injured stock, was made by the defendant's authorized agent, it was evidence of waiver to go to the jury: for "the party to be charged waives the forfeiture if with knowledge of the facts he requires the claimant to do some act, or incur some trouble or expense, inconsistent with the position that the contract had become inoperative in consequence of the breach of its conditions." *Hayes* v. *Tel. Co.,* 70 S. C., 22, 48 S. E., 608, 67 L. R. A., 481; *Madden* v. *Phoenix Ins. Co.,* 70 S. C., 295, 49 S. E., 855; *Cobb and Seal* v. *Ins. Co.,* 78 S. C., 397, 58 S. E., 1099; *Davis* v. *R. R. Co.,* 81 S. C., 472. Even if the Georgia law be applied, the case of *Arnold* v. *Louisville & Nashville R. R. Co.,* 61 S. E., 1050, introduced in evidence by the plaintiff, and the cases cited in the opinion of the Court, show that in Georgia such stipulation may be waived by the carrier. In the absence of proof to the contrary, we must presume that the same evidence would be sufficient to carry the case to the jury on the issue of waiver in that State as in this.

But the defendant's counsel contends that there was no evidence that the request given over the telephone to the plaintiff, Gaffney, that he procure a veterinary surgeon, was made by the defendant. The soundness of this proposition depends on whether one who answers a telephone call from the place of business of the person called for, and undertakes to respond as the agent, is presumed to speak for him in respect to matters of the general business carried on by such person at that place. The authorities are not in accord, but we think the weight of reason and authority is in favor of such presumption. Those who install telephones in their places of business, in connection with a telephone exchange, and use them for business purposes, impliedly invite the business world to use that means of communicating with them with respect to the business there carried on; and the presumption is that they authorize communications made over the telephone in ordinary business transactions. *Gen. Hosp. Co.* v. *New Haven etc. Co.,* 79 Conn., 521, 65 Atl. 1065, 118 Am. St., 173, and note; note 6 L. R. A. (N. S.), 1180; *Godair v. Ham. Nat'l. Bank,* 225 Ill., 572, 80 N. E., 407, 116 Am. St., 172, and note; *Wolfe* v. *Pac. Ry. Co.,* 97 Mo., 473, 10 Am. St., 331; 3 Wigmore on Evidence, sec. 2155; *Read* v. *Ry.,* 72 Iowa, 166, 2 Am. St., 243; *Oskamp* v. *Gadsden* (Neb.), 17 L. R. A., 440. The reason is the same as that for the presumption that a business letter, properly directed and sent by mail, reaches the business office of the addressee, and is opened by him or his authorized agent.

The presumption that the person who answers is authorized to speak may be very slight or strong according to the circumstances, but the statements of such persons should be admitted in evidence as *prima facie* the statements of one having authority to speak. It is important to observe that the presumption extends only to communications relating to the usual business carried on at the place from which the telephone communication comes. To illustrate the rule

and limitation, there is a presumption that a communication purporting to come from a local railroad freight office, relating to loss or injury incurred by owners of freight shipped to the station where the office is located, is made by authorized agents; but there would be no presumption that a telephone communication purporting to come from such a local freight office, relating to the general management of the road, was authorized by the railroad company.

Some authorities hold such communications not competent unless the witness identified the voice as that of an employee in the place of business of the party to be charged. *Young* v. *Seattle Transfer Co.*, 99 Am. St., 947; *Planter's Cotton Oil Co.* v. *W. U. Tel Co.*, 6 L. R. A. (N. S.), 1180. We do not think such identification necessary to the admissibility of the evidence, for the reason above stated. But even if that rule were adopted, the evidence here was admissible, because Gaffney testified that he recognized the voice as that of a clerk in defendant's office.

The judgment of this Court is, that the judgment of Circuit Court be affirmed.